**TAFT BROADCASTING CO., WDAF AM–FM–TV, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 20519.

United States Court of Appeals, Eighth Circuit.

May 17, 1971.

Frank H. Stewart, Cincinnati, Ohio, for petitioner.

Frank Vogl, Atty., N. L. R. B., Washington, D. C., for respondent.

Before ALDRICH,* LAY and BRIGHT, Circuit Judges.

ALDRICH, Circuit Judge.

Taft Broadcasting Co., WDAF AM–FM–TV brings this petition to review and set aside an order of the National Labor Relations Board based upon a finding of a refusal to bargain under sections 8(a) (5) and (1) of the Act, 29 U.S.C. 158(a) (5) and (1), by effecting a unilateral, unnegotiated change in working conditions, viz., the elimination of arbitration as the final step in the grievance procedure. 185 N.L.R.B. No. 68 (1970). The Board cross petitions for enforcement. The evidentiary facts are essentially undisputed, and the prin-

* Of the First Circuit, sitting by designation.

cipal questions relate to the inferences and conclusions that are warranted therefrom.

A 1963 collective bargaining agreement with the union[1] expired in 1965 and the union went on strike. In April 1966 the strike was terminated when the parties executed a rough draft agreement. However, when Taft, on June 22, 1966, submitted an agreement in finished form the union claimed discrepancies and failed to sign it. On April 3, 1967, Taft wrote the union, advising it as follows.

"A reasonable length of time having long since elapsed since the draft was submitted to you for signature without acceptance by you, the proposals therein contained are now withdrawn, and we are rescinding any understanding or agreement between the parties which may have been reached on April 18, 1966, as reflected in the draft of June 22, 1966.

"For your information and the information of the affected employees, it is our intention to continue in effect the wages, hours, and other conditions of employment presently in effect as fully set forth in the draft of June 22, 1966, and we will continue handling any grievances that may arise in accordance with the procedure set forth therein. There can, of course, be no enforcement of the union security provisions.

"We do not by this letter attempt or purport to withdraw recognition from your union as the exclusive bargaining representative of our employees in an appropriate unit, and we are prepared to negotiate with you in good faith in order to reach a satisfactory collective bargaining contract. In the meantime, if we feel any change is desirable which may affect the present wages, hours, and working conditions of our employees, we will advise you in advance so that you will have the opportunity to negotiate on them before any changes are made."

The union did not respond. From time to time desultory, but ineffective, exchanges took place with regard to other matters, and in February 1968 Taft discharged an announcer, Gray, contending that his job was gone. The union sought to invoke the grievance procedure, but was rebuffed. By letter of July 3, 1968, it demanded arbitration. On July 22 Taft replied as follows:

"Receipt is acknowledged of your letter of July 3, in which you request a meeting to select an arbitrator to hear a 'grievance' arising out of the termination of Martin Gray and another arising out of an annual earnings guarantee. The request contained in your letter is denied.

"As you know, the duty to arbitrate arises out of a contract. There is no executed document between your organization and our stations containing an agreement to arbitrate."

The union thereupon filed the charge that initiated this proceeding.

The June 22, 1966 draft tendered by Taft, as well as the 1963 agreement, contained the following provision.

## "ARTICLE VII—GRIEVANCE PROCEDURE AND ARBITRATION

"In the event of any difference of opinion between the parties hereto [relating to] * * * any controversy as to rates of pay, wages, hours or other conditions of employment, the following procedure shall be adopted for the settlement of such controversy:

(a) Any employee shall first present his grievance to his department head and such department head shall proceed promptly in an attempt to dispose of such grievance. The AFTRA steward will be given the opportunity to be present at such adjustment.

1. American Federation of Television and Radio Artists, AFL-CIO (AFTRA), Kansas City Local.

(b) If the grievance is not thus adjusted, then the grievance shall be reduced to writing and presented to the COMPANY by AFTRA within (90) days after knowledge of the occurrence on which the grievance is based, and AFTRA and the COMPANY shall then meet and attempt promptly to dispose of the grievance by agreement.

(c) If the grievance is not settled by the foregoing procedure as provided in (b) above, the grievance shall be considered as closed and not subject to arbitration unless the union requests in writing that the matter be submitted to arbitration. Such request for arbitration shall be within six (6) months of the notice of the grievance. Matters relating to Union Shop and Pension and Welfare Contributions shall not be subject to the above time limitations.

(d) Upon receipt of the notice of taking a grievance to arbitration, the parties will meet as soon as reasonably possible for the purpose of selecting an Arbitrator. * * *

"The decision of the Arbitrator shall be delivered in writing as soon as reasonably practicable following the hearing or other submission of the grievance, and shall be final and binding on the parties hereto and judgment on such award may be entered in the highest court of the forum, state or federal, having jurisdiction thereof."

At no time, so far as appears, has this provision been, in form or substance, a matter of negotiation or dispute.

The Board found that Taft's letter of April 3, 1967 was the basis for an interim agreement that the various enumerated terms and conditions of employment set out in the June 22 draft, as well as the grievance procedures detailed therein, would continue in effect unless the union was given an opportunity to negotiate over any change. On this basis it held that Taft's rejection on July 22, 1968 of any duty to arbitrate, without giving the union a chance to discuss this change, was a violation of its duty to bargain.

Taft makes two replies that merit discussion. The first is that the reference in the letter to the "handling [of] grievances * * * in accordance with the procedure set forth" in the draft of June 22, 1966 encompassed only the first steps of the procedure provided by Article VII and did not include the provision for arbitration. It points to the fact that Article VII is headed "Grievance Procedure and Arbitration." On examination of the text, ante, as well as the title of the article, it seems to us that one could fairly consider that arbitration, as the means of attaining final resolution of all disputes, was part of the grievance procedure. Hence there was at least a question of fact for the Board to resolve. We are not persuaded by Taft's argument that the Board was compelled to resolve the issue in its favor. Its counsel, Willard, who wrote the letter, testified,

"I intended to provide a grievance procedure not an arbitration, that is why I said grievance and not grievance procedure and arbitration."

In its brief Taft seemingly contends that this testimony was entitled to particular weight because Willard was "an experienced labor lawyer and a partner in a distinguished firm." We know of no such principle of construction. More in point is the rule that ambiguities in contracts are to be construed against the drafter. E. G., Ferber Co. v. Ondrick, 1 Cir., 1962, 310 F.2d 462, 465, *cert. denied* 373 U.S. 911, 83 S.Ct. 1300, 10 L. Ed.2d 412; Harrison Sheet Steel Co. v. Morgan, 8 Cir., 1959, 268 F.2d 538, 543; E.I. DuPont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 1933, 64 F.2d 224, 228, *cert. denied* 290 U.S. 646, 54 S.Ct. 64, 78 L.Ed. 561.

Taft's alternative contention is that its letter was a statement of intent, nothing more, and did not impose any obligation upon it. We seriously question whether a statement of intent by an

employer that a particular undertaking, such as submission of unresolved grievances to arbitration, will not be abandoned without an opportunity for the union to negotiate, can later be treated as meaningless and without effect. The contention that it can be treated as so much scrap paper after it has achieved whatever purpose the employer had in mind does not sit well.[2] However, the Board did not rest its decision on such a principle, or at least did not express its position in such broad terms. Instead, it found that there was in fact an interim agreement to arbitrate unresolved grievances. Under all the circumstances we cannot fault the findings that are the foundation of the Board's more limited approach.

It is to be borne in mind that, as earlier stated, a grievance procedure that included arbitration had been contained in the 1963 contract, was tendered in the 1966 draft, and had never been a matter in issue. After an extended period of time without any contract, during which interval there had been a prolonged strike, the parties saw an attempted resolution of their differences come to nought when Taft withdrew its proposed draft agreement in its April letter. In this context the letter can properly be regarded as offering, at the same time, to continue, at least for a while, certain practices. While in one breath Taft asserts that the letter could not ripen into a contract unless the union formally accepted it, in the next it says, quite correctly, that "[t]he letter calls for no response on the union's part, either by action or by reply." Although Taft would draw different conclusions from this fact, we conclude that the Board could properly find that the union's inaction was, contractually, just what was called for. Nor does Taft advance its case by proof that in areas outside the scope of the letter the union recognized that it had no agreement. Such proof casts no light on whether there was a limited agreement concerning the matters affirmatively expressed.

The employer's petition is dismissed. The order of the Board will be enforced.

2. In The Hilton-Davis Chemical Div. of Sterling Drug, Inc., 185 N.L.R.B. No. 58 (1970), which figures prominently in Taft's brief, a divided Board held that the principle of N.L.R.B. v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230, that an opportunity to bargain must be afforded to the union before making changes after the expiration of a contract, does not extend to an agreement to arbitrate. We can understand the Board's reluctance to say that the union can have all the benefits of the contract although it has rejected its obligations. However, *assuming that decision to be correct, it does not follow that the employer cannot be charged with a duty if he openly assumed it.* It is of passing interest that in *Hilton-Davis* the employer did state it would continue the earlier stages of the grievance procedure, and was careful to exclude arbitration. It is also interesting to note that the undertaking it did make was manifestly for the purpose of reducing employee discontent.