CHAUFFEURS, TEAMSTERS AND HELPERS, LOCAL UNION 238, Appellant,

v.

C.R.S.T., INC. (sic), Appellee.

No. 85–1301.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1986.

Decided July 16, 1986.

---

Neil A. Barrick, Des Moines, Iowa, for appellant.

Robert E. Konchar, Cedar Rapids, Iowa, for appellee.

Before LAY, Chief Judge, HEANEY, ROSS, HENLEY, Senior Circuit Judge, and McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN and MAGILL, Circuit Judges, en banc.

HENLEY, Senior Circuit Judge.

Chauffeurs, Teamsters and Helpers, Local Union 238 (Union) sued CRST, Inc. (CRST) in Iowa State District Court based on 29 U.S.C. § 185(a) because of its refusal to arbitrate a grievance filed by Jerry Ottaway, an employee and Union member. The case was removed by defendant's motion to the United States District Court for the Northern District of Iowa[1] pursuant to 28 U.S.C. § 1441. CRST then filed a motion for summary judgment. The district court granted this motion finding that no collective bargaining agreement requiring arbitration was in existence when the discharge occurred.

On appeal, a panel of this court reversed. *Chauffeurs, Teamsters and Helpers, Local Union 238 v. C.R.S.T., Inc.,* 780 F.2d 379 (8th Cir.1985). It determined that while summary judgment was proper because no genuine issue of fact remained, the district court erred in its resolution of the merits. *Id.* at 381. The panel found that a unilateral schedule of wages and hours implemented by CRST after an impasse had been reached contained ambiguous terms concerning grievance procedures, thereby demonstrating an intention to continue arbitrating grievances. *Id.* at 383–84. The district court was instructed to enter judgment for the Union and require Ottaway's grievance to be submitted to arbitration. *Id.* at 384.

CRST sought rehearing en banc, arguing that there is no duty to arbitrate because the events surrounding Ottaway's grievance occurred over a year after the expiration of the agreement, and that its unilater-

**1.** The Honorable Edward J. McManus, now United States Senior District Judge, Northern District of Iowa.

al schedule was limited in its wording and did not create an extension of any contractual duty to arbitrate a claim of wrongful discharge.

On rehearing en banc we now hold that the judgment of the district court should be affirmed.

From July 1, 1979 to June 30, 1982 CRST employed drivers under a collective bargaining agreement between it and the Union. The parties undertook to negotiate a new contract but were unable to agree on its terms. In December, 1982 CRST notified its employees that an impasse had been reached and that it was unilaterally implementing a schedule of wages, hours and working conditions consistent with its final offer to the Union.

In July, 1983 Ottaway was terminated by appellee following an accident for which CRST determined he was responsible. He claimed to have been discharged without just cause and then submitted a grievance to the Union which pursued the matter according to the procedures prescribed in the expired agreement. CRST, however, refused to arbitrate the grievance maintaining that no agreement containing such a requirement was in effect between the parties.

In the affidavits submitted with its motion for summary judgment, CRST established that: (1) there was no agreement between the parties as to how to handle grievances after the expiration of the collective bargaining agreement; (2) during the negotiations both sides proposed grievance procedures which were different from those in the expired agreement; (3) the December, 1982 schedule did not include a grievance procedure although it did provide for seniority disputes to be resolved through such a procedure; and (4) CRST had rejected all attempts by the Union to arbitrate grievances.

The Union's resistance to this motion did not include any affidavits contradicting these statements. Rather, in its reply appellant asserted that the existence of a grievance procedure could be inferred because CRST's unilateral schedule allowed for resolving seniority disputes in this manner and without a grievance procedure this language would be superfluous. Moreover, as no procedure had been settled upon by the parties, the Union alleged that the procedures in the expired agreement remained in force.

On appeal, it is suggested that presence of a grievance procedure can be inferred because CRST's unilateral schedule of wages was consistent with the Company's final offer, and it can be assumed that a grievance procedure was a part of the last offer.

We have been tempted to consider the question whether the grievance procedure in the Company's final offer would be an appropriate method of resolving Ottaway's dispute. However, at oral argument we were assured that no such issue was raised before the district court, that the record does not disclose what the procedure is,[2] and that resort to such procedure was not to be considered an issue before this court. Accordingly, we shall not dwell upon it further. We are left then with the question whether the grievance procedure of the expired contract applied to Ottaway's discharge.

In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in a light most favorable to the non-moving party and the burden is placed on the moving party to establish that no genuine issue as to a material fact remains and that the case may be decided as a matter of law. Fed.R. Civ.P. 56(c); *Fields v. Gander,* 734 F.2d 1313, 1314 (8th Cir.1984); *Shearer v. Homestake Mining Co.,* 727 F.2d 707, 709 (8th Cir.1984); *Snyder v. United States,* 717 F.2d 1193, 1195 (8th Cir.1983). However, once the moving party has met this burden, the non-moving party may not rest

---

**2.** We know that there was a dispute over grievance and arbitration procedures to be included in a new contract and that such dispute had not been resolved when impasse in negotiations was reached.

on the allegations in its pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of fact remains. Fed.R.Civ.P. 56(e); *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.1984); *Bouta v. American Federation of State, County & Municipal Employees*, 746 F.2d 453, 454 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1764, 84 L.Ed.2d 825 (1985).

■ Appellant has not set forth any evidence which would contradict the facts as established by CRST. The inferences the Union seeks to raise do not in our view demonstrate a genuine issue of evidentiary fact, but rather point up the ultimate issues which must be resolved in interpreting the agreements and actions of the parties. Therefore, the district court properly decided this case as a matter of law.

This case deals with two somewhat conflicting principles. One is the proposition that the duty to arbitrate a dispute must arise from a contract and no one may be forced to arbitrate outside of an express agreement to do so. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). The other is the federal labor policy which favors settling disputes through arbitration. *Id.* at 582–83, 80 S.Ct. at 1352–53.

These policies were dealt with in *Nolde Bros. v. Local 358, Bakery and Confectionery Workers Union*, 430 U.S. 243, 255, 97 S.Ct. 1067, 1074, 51 L.Ed.2d 300 (1977), where the Court held that the right to arbitrate a severance pay dispute survived the expiration of the collective bargaining agreement. In *Nolde* the agreement expired while negotiations were ongoing. Approximately one month later the Union served notice that it was cancelling the agreement. Four days after the termination of the contract Nolde closed its plant and refused to give the severance pay required in the collective bargaining agreement. The Court found that the dispute, "although arising *after* the expiration of the collective-bargaining contract, clearly arises *under* that contract." *Id.* at 249, 97

S.Ct. at 1071 (emphasis in the original). It also stated the presumption that arbitration provisions are intended to survive the expiration of collective bargaining agreements. *Id.* at 255, 97 S.Ct. at 1074. This is based on the policy favoring arbitration and the rationale that the arguments in support of arbitration do not end with the agreement. *Id.* In order for this presumption to be terminated it "must be negated expressly or by clear implication." *Id.*

A panel of this court has recently had an opportunity to interpret *Nolde* in *Garland Coal & Mining Co. v. United Mine Workers*, 778 F.2d 1297, 1301 (8th Cir.1985). There, focusing on the presumption of arbitrability, we found that it had been negated by clear implication based on the contract language and acts of the parties. *Id.* This focus is inappropriate here, however, because while the parties in *Garland* did not dispute that the grievances arose under the expired agreement, *id.* at 1301 n. 7, here CRST vehemently contests this issue. Therefore, before we limit our examination to the *Nolde* presumption, we must first determine whether the disputed right arose under the collective bargaining agreement. *See International Brotherhood of Electrical Workers v. Nanco Electric, Inc.*, 790 F.2d 59, 61 (8th Cir.1986) (per curiam).

How to apply the narrow holding of *Nolde* and its broad presumption has created some confusion among courts in determining the arbitrability of post-expiration grievances. *See County of Ottawa v. Jaklinski*, 423 Mich. 1, 377 N.W.2d 668, 674–75 (1985). However, all of the courts appear to require that for a right to arbitration to exist the grievance must either involve rights which to some degree have vested or accrued during the life of the contract and merely ripened after termination, or relate to events which have occurred at least in part while the agreement was still in effect. *See Glover Bottled Gas Corp. v. Local Union No. 282, International Brotherhood of Teamsters*, 711 F.2d 479, 482 (2d Cir.1983) (discharge of employees arbitrable where all acts leading to discharge occurred before termination of con-

tract); *O'Connor Co. v. Carpenters Local Union No. 1408,* 702 F.2d 824, 825 (9th Cir.1983) (use of nonunion employees on job site after termination of contract is not arbitrable);[3] *Diamond Glass Corp. v. Glass Warehouse Workers and Paint Handlers Local Union 206,* 682 F.2d 301, 303–04 (2d Cir.1982) (arbitration not required where union failed to state facts showing dispute related to rights arising from contract); *Federated Metals Corp. v. United Steelworkers,* 648 F.2d 856, 861 (3d Cir.) (dealt with pension plan rights), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *United Steelworkers v. Fort Pitt Steel Casting Division-Conval-Penn, Inc.,* 635 F.2d 1071, 1075, 1079 (3d Cir.1980) (dealt with severance pay, vacation pay, life insurance coverage and pension plan rights), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 843 (1981); *cf. Teamsters Local Union 688 v. John J. Meier Co.,* 718 F.2d 286 (8th Cir.1983) (employees entitled to vacation pay because eligibility requirements met before expiration of agreement).

The disputed right here, the right to be discharged for just cause, is dissimilar to the rights found arbitrable above such as severance pay and vacation pay, because it cannot be worked towards or accumulated over time. *See Jaklinski,* 423 Mich. at 25–27, 377 N.W.2d at 679. Rather, it is strictly a creature of the collective bargaining agreement and its life as a matter of contract does not extend beyond contract expiration.

Also, the facts here do not reveal any events which occurred prior to contract termination. The accident which resulted in Ottaway's discharge occurred after the termination of the agreement and nothing relates the dispute back to events which occurred during the time of the contract.

We conclude that the right involved here did not arise under the contract, thereby making the *Nolde* presumption inapplicable.

Moreover, the passage of more than one year between the expiration of the contract and the employee's discharge also makes application of the *Nolde* presumption of doubtful propriety. The Court in *Nolde* limited its holding by stating that "we need not speculate as to the arbitrability of post-termination contractual claims which, unlike the one presently before us, are not asserted within a reasonable time after the contract's expiration." *Nolde,* 430 U.S. at 255 n. 8, 97 S.Ct. at 1074 n. 8. To find that this grievance "arises under the contract," *id.* at 249, 97 S.Ct. at 1071, would give these words a much broader meaning than we believe the *Nolde* Court ever intended. This interpretation "would mean that parties to a collective-bargaining agreement would be presumed to intend that any dispute arising between them years or even decades after the expiration of the agreement would be arbitrable." *Local 703, International Brotherhood of Teamsters v. Kennicott,* 771 F.2d 300, 303 (7th Cir.1985).

■ We also believe a duty to arbitrate the present dispute under the old contract machinery cannot be found from CRST's unilateral schedule of wages and hours. The schedule's mention of a grievance procedure to determine seniority rights cannot be interpreted as allowing for arbitration of all disputes, but rather should be read as a clear statement showing explicitly how far CRST intended arbitration to reach. If CRST had intended arbitration to reach further, it would have so stated in the schedule.

In support of its position the Union refers to *Taft Broadcasting Co. v. NLRB,* 441 F.2d 1382 (8th Cir.1971). In *Taft,* after the termination of a prior agreement, the

---

**3.** *O'Connor* could be seen to be limited by *George Day Constr. v. United Bhd. of Carpenters and Joiners,* 722 F.2d 1471 (9th Cir.1984), which found a duty to arbitrate a grievance (use of nonunion subcontractors on two job sites) where the dispute arose after expiration of the collective bargaining agreement but before an

impasse was reached. *George Day* can be distinguished, however, because there the court held that the employer, by arguing its position in front of an arbitrator before filing suit, had impliedly consented to the arbitrator deciding both the arbitrability question and the merits of the case. *Id.* at 1475.

employer sent the union a letter stating that the terms of employment, including grievance procedures, as set out in a draft agreement would be in effect until the union had an opportunity to negotiate any changes. *Id.* at 1383–84. In that case we held that this letter gave rise to an interim agreement to arbitrate grievances. *Id.* at 1385. No such interim agreement can be found here, however, as CRST's unilateral schedule does not broadly agree to arbitrate all controversies but rather only disputes concerning seniority.

As the disputed right did not arise under the expired agreement or occur within a reasonable time after its termination, and because CRST's unilateral schedule does not allow for grievance procedures except in the limited circumstances involving seniority rights, we conclude that Ottaway's discharge is not arbitrable.

Accordingly, the judgment of the district court is affirmed.

LAY, Chief Judge, dissenting, with whom HEANEY, Circuit Judge, concurs.

I dissent.

### I.

Although I agree that once impasse in negotiations has been reached, an employer has the right to unilaterally institute terms and conditions of employment and in doing so is not bound to those contained in the expired agreement, the majority's analysis completely ignores the principle that an employer may act unilaterally after impasse only if its action is reasonably comprehended within its preimpasse bargaining proposals. *United Steelworkers of America, AFL–CIO v. Fort Pitt Steel Casting Division-Conval-Penn, Inc.,* 635 F.2d 1071, 1078 (3rd Cir.1980) (citing *NLRB v. Crompton-Highland Mills, Inc.,* 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949)).

Despite an employer's right to act unilaterally after impasse, it is clear that the working conditions which have characterized an employment relationship do not cease to exist on the date a collective bargaining agreement terminates. This court emphasized in *Richardson v. Communication Workers of America,* 443 F.2d 974, 978 (8th Cir.1971), *cert. denied,* 414 U.S. 818, 94 S.Ct. 38, 38 L.Ed.2d 50 (1973), that

the collective bargaining agreement is not an ordinary contract but rather, in a sense, agglomerates a variety of rights and methodology relating to the employer, the union, and the employees.

\*    \*    \*    \*    \*    \*

The expiration date of a bargaining contract does not place the employee in jeopardy of losing his job at the termination of the agreement. In fact one of the very incentives to union representation is job security. The employee, the union which represents him, the company which employs him, each contemplate [sic] a "subsisting" contractual relationship for an indefinite period of time. Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1 (1958). Note, 61 Column.L.Rev. 1363 (1961) [sic].

\*    \*    \*    \*    \*    \*

The collective bargaining agreement in addition recognizes seniority rights, which \* \* \* affect vacation pay, severance pay, pension rights and the expectancy not to be laid off during slack periods of work. It has been recognized that many of these rights may survive the termination of the agreement.

*Richardson,* 443 F.2d at 978–79 (citations omitted). The dispute involved here, whether an employee may be discharged without "just cause," raises a continuing right vested under the contract as was the right to severance pay in *Nolde Brothers, Inc. v. Local No. 358, Bakery and Confectionery Workers Union, AFL–CIO,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). To hold otherwise, as the majority does, relegates all employees upon termination of the collective bargaining agreement to a status of mere employment at will. No decision of which I am aware has ever suggested such a rule until now.

## II.

However, there are even more persuasive reasons why this grievance should be submitted to grievance procedures. The undisputed facts of this case are distinguishable from cases which involve only the question of what terms and conditions survive an expired collective bargaining agreement after impasse. Here, CRST unilaterally implemented a schedule of wages, hours, and other terms and conditions of employment "consistent with its final offer." Though the unilateral schedule described no detailed grievance procedure, the schedule did provide:

Section 2. Seniority List

\* \* \* \* \* \*

Protest to any employee's seniority date or position on the list must be made in writing to the employer within thirty (30) calendar days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct. Any such protest which is timely made may be submitted to *the* grievance procedure. (our emphasis).

In construing *"the* grievance procedure," we find instructive our reasoning in *Taft Broadcasting Co., WDAF AM–FM–TV v. NLRB*, 441 F.2d 1382 (8th Cir.1971). In *Taft*, a draft collective bargaining agreement remained unsigned by the Union due to bargaining discrepancies in the version presented to it for execution. The employer then sent a letter to the union advising that it intended to unilaterally implement wages, hours, and other terms and conditions of employment as set forth in the draft agreement, and would continue handling grievances that arose in the future in accordance with the procedure set forth in the draft. When the union later filed a grievance on behalf of an employee discharged after this unilateral imposition of working conditions, the employer refused to arbitrate on the grounds that the duty to arbitrate arises only out of a contract and that no executed contract between the employer and the union existed. This court disagreed, noting that the NLRB had found the employer's letter to be an interim agreement in which the ambiguous terms regarding arbitration were to be construed against the employer as the drafter of the agreement. *Taft*, 441 F.2d at 1384.

The district court in its memorandum order granting summary judgment to CRST did recognize that CRST's unilateral schedule could be seen to constitute a contract between CRST and the Union. However, in reaching its conclusion that the only grievable matters under the schedule are seniority dates and positions the district court, now joined by the majority, failed to apply the principle of judicial construction of labor contracts as articulated in *Taft* that ambiguities in contract provisions are to be construed against the drafter, with all reasonable doubts as to interpretation resolved in favor of the other party. *See Taft*, 441 F.2d at 1384; *cf. Ross v. Royal Globe Insurance Co.*, 612 F.2d 379, 381 (8th Cir.1980) (given possible conflicting interpretations of a contract provision, the district court should adopt the construction which most favors the party who had no part in preparing the contract).[1]

Whatever CRST's intent, the schedule's silence as to the submission of other issues besides seniority to the grievance procedure rendered the schedule ambiguous and compels the conclusion that the unilateral schedule did not preempt Ottaway's discharge from being subject to grievance procedures. *Cf. Johnson Controls, Inc. v. City of Cedar Rapids, Iowa*, 713 F.2d 370, 375 (8th Cir.1983) (court's function in construing a contract is to determine the parties' intent from what is said and not from what they meant to say); *see also Minot Builders Supply Association v. Teamsters Local 123*, 703 F.2d 324, 327–28 (8th Cir.

---

**1.** This court has also stated, in the context of interpreting the terms of an ERISA plan, that "where one of the parties draws a contract and the other \* \* \* cannot vary the terms, the bur-

den is upon the party drawing the contract to make the meaning plain." *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1354 (8th Cir.1980) (citations omitted).

1983) (discharge was arbitrable where collective bargaining agreement did not state explicitly that discharges are not subject to arbitration; doubts regarding arbitrability should be resolved in favor of coverage). It seems clear from CRST's own reference to *"the* grievance procedure" in the unilateral schedule that CRST intended to retain a grievance procedure in its continuing relationship with the Union and the employees. The schedule nowhere expressly rejected the use of grievance procedures for issues other than seniority. It should be borne in mind here that while the exact grievance and arbitration procedures proposed by the Union and CRST during contract negotiations differed, the inclusion of a grievance procedure in the final contract was itself never questioned. As in *Taft,* CRST's unilateral schedule operates as an interim agreement retaining a grievance procedure for the resolution of disputes regarding terms and conditions of employment. This is especially true in a situation where impasse has been reached and the employer has unilaterally instituted a set of wages, hours and other working conditions purportedly consistent with a "final offer." This court has previously found that a grievance or arbitration procedure is a term or condition of employment, *NLRB v. Independent Stave Co., Diversified Industries Division,* 591 F.2d 443, 446 (8th Cir. 1979), *cert. denied,* 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979) (citing *Taft Broadcasting Co., WDAF AM–FM–TV v. NLRB,* 441 F.2d 1382 (8th Cir.1971)).

The record is replete with references to the grievance procedure proposals advanced by both parties during negotiations. For example, the August 31, 1984 affidavit of Lawrence B. Pollard, a Director of Industrial Relations for CRST during the period in question, states that "proposals by the company spelled out grievance machinery which only included final and binding arbitration. [The union proposed a different procedure.] Neither grievance procedure was the same as that contained in the expired collective bargaining contract." Undisputedly, CRST's offer was never limited to a grievance mechanism applicable only to seniority issues. Contrary to the history of bargaining between the parties, the majority approves implementation of a grievance procedure limited to arbitration only of seniority rights which was not only *not* comprehended within CRST's preimpasse bargaining proposals but totally contrary to the earlier collective bargaining agreement. This holding has no support in any case law of which I am aware; the majority cites no authority in support of its unprecedented analysis.

CRST plainly created a duty to submit disputes arising under the interim schedule regarding terms and conditions of employment to a grievance procedure by its representation that it was implementing working conditions consistent with its final offer to the Union. This conclusion is reinforced by the Supreme Court's observation that:

> [t]he contracting parties' confidence in the arbitration process and an arbitrator's presumed special competence in matters concerning bargaining agreements does not terminate with the contract. Nor would their interest in obtaining a prompt and inexpensive resolution of their disputes by an expert tribunal. Hence, there is little reason to construe this contract to mean that the parties intended their contractual duty to submit grievances and claims arising under the contract to terminate immediately on the termination of the contract; the alternative remedy of a lawsuit is the very remedy the arbitration clause was designed to avoid.

*Nolde,* 430 U.S. at 254, 97 S.Ct. at 1073. CRST's reference to a grievance procedure indicates that at the time CRST implemented the unilateral schedule it contemplated that, for at least an interim period, employer-employee friction over working conditions would be resolved by a method of dispute resolution other than lawsuits.

This construction does not interfere with CRST's right to act unilaterally after bargaining has reached an impasse, but merely holds CRST to the reasonable meaning of an ambiguous term it chose to incorporate in its unilateral schedule. The majori-

ty's analysis glosses over the fact that CRST *did not* refer in its unilateral schedule to a grievance procedure applicable only to seniority, but to *"the"* grievance procedure, application of which outside of seniority disputes was ambiguous. Rather than being the "clear statement showing explicitly how far CRST intended arbitration to reach" which the majority describes, the unilateral schedule's language is precisely the sort which should be construed against CRST as the drafter. For the majority to revise CRST's imprecise drafting by rewriting the unilateral schedule to mean what CRST now wishes it said crosses the bounds of appropriate appellate review and is contrary to the principles of labor law previously articulated by both this court and the Supreme Court.

Judicial application of legal principles often results in philosophical disagreement with the decision which precedent requires; judicial officers nevertheless must strive to uniformly apply the law as it exists.

For the reasons set forth above, I dissent.

HEANEY, Circuit Judge, dissenting, with whom LAY, Chief Judge, concurs.

The majority opinion is well written and logical. The problem is that it ignores the facts and is inconsistent with Chief Justice Burger's opinion in *Nolde.*

The majority fails to note that prior to impasse CRST made a final offer which contained a proposed grievance and arbitration procedure and continued protection against discharge without just cause. When the union rejected the final offer, CRST informed its employees that an impasse had been reached in negotiations and that it intended to implement the final offer. It posted a notice stating: "Since negotiations have reached an impasse and the prior collective bargaining agreement has

expired, the Company will place into effect wages, hours *and other working conditions* consistent with its final offer." [1] (Emphasis added.) ("December 23, 1982 Notice to All Over-The-Road Employees," by Lawrence B. Pollard, Director of Industrial Relations.)

Under these circumstances, as a matter of simple contract law, CRST remained obligated to continue in effect the grievance and arbitration procedure contained in its final offer. The company's statement unequivocally led its employees to believe that these critical protections would continue and that CRST's proposal was preferable to a strike. *See Richardson v. Communications Workers of America,* 443 F.2d 974, 978 (8th Cir.1971), *cert. denied,* 414 U.S. 818, 94 S.Ct. 38, 38 L.Ed.2d 50 (1973) (So long as employees continue to be represented by a union, the working conditions which have characterized an employment relationship, including the right to protection from wrongful discharge, do not necessarily cease to exist on the date of contract expiration.). When its employees remained on the job, CRST's posted notice and final offer became a binding unilateral contract.

Even if this explicit language had not been contained in the company's final offer and its published statement that the conditions set forth in the final offer would prevail, the Supreme Court's opinion in *Nolde* would require a result different than that reached by the majority. As the Court stated:

The parties must be deemed to have been conscious of this policy [of favoring arbitration of labor disputes] when they agree to resolve their contractual differences through arbitration. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations

---

1. CRST then distributed a schedule of wages and hours, which contained a reference to "the grievance procedure." The majority contends that this reference applies only to seniority disputes. However, it should be noted that the unilateral contract's provisions on employee discharges also are placed under the heading, "Loss of Seniority." Moreover, the schedule nowhere states or implies that there would no longer be a grievance procedure, or protection from discharge without cause.

cease with the agreement, affords a basis for concluding that they intended to arbitrate *all* grievances arising out of the contractual relationship. In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication. [Emphasis added.]

430 U.S. at 255, 97 S.Ct. at 1074.

Here, although this principle was clearly established in 1976, the 1979 agreement between CRST and the union does not indicate expressly or by clear implication that grievances arising after termination will not be arbitrable. Nor is there any other evidence in the record which negates the *Nolde* presumption.

The majority reaches the conclusion that *Nolde* is inapplicable by adopting an oblique accrual theory which was advocated by the two dissenters in *Nolde* and rejected by the seven-justice majority. The dissent in *Nolde* argued that "the right in dispute, though claimed to arise under the contract, ripened only after the contract had expired and the employment relationship had terminated." 430 U.S. at 258, 97 S.Ct. at 1075. The majority stated that, "However, it is clear that, whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given the contract clause providing for severance pay. The dispute, therefore, although arising *after* the expiration of the collective bargaining contract, clearly arises *under* that contract." *Id.* at 249, 97 S.Ct. at 1071. In other words, when the dispute concerns the interpretation to be given a provision of an expired agreement, the dispute arises under the contract and there is a strong presumption of continuing arbitrability.

Here, the dispute is over the wrongful discharge provisions of the expired collective bargaining agreement. Section three of CRST's unilaterally implemented employment contract, entitled "Loss of Seniority" states:

SECTION 3. LOSS OF SENIORITY

Seniority shall be terminated and the employer-employee relationship shall be severed by any of the following:

1. Discharge.

2. Voluntary quit.

3. Three (3) year layoff without regaining full-time status.

4. Unauthorized absence for three (3) successive scheduled work days.

5. Failure to make himself available for work at the end of ten (10) days after notice of recall is mailed to his last known address. A copy of the notice of recall shall be sent to the union.

6. Failure to obtain or comply with leave of absence provisions as set forth in this agreement.

7. Refusal to accept instructions given by a proper supervisor of the Company and/or to perform any work assignment unless it will affect his health or safety.

This section suggests that CRST's employees were still protected against discharge without cause as specified under the expired collective bargaining agreement, and CRST never contended in any of the documents in the record or at oral argument, that its employees are now "employees at will." Indeed, it only discharged Jerry Ottaway after determining, on its own accord, that he was guilty of "reckless driving." Recognizing the serious nature of this charge and its promise to continue protection against wrongful discharge, CRST, at one point, agreed to submit this dispute to arbitration, something totally unnecessary if it believed that it could discharge employees without cause and without submitting the dispute to arbitration.

The meaning, then, of "discharge" under the unilateral contract can only be determined by looking back to the 1979 collective bargaining agreement's provision on protection from discharge without cause or by looking at the wrongful discharge provisions of CRST's final offer. Indeed, one of CRST's briefs before the trial court states that the underlying dispute is over whether "one of its [employees] was wrongfully dis-

charged from his employment by CRST in violation of the terms of a collective bargaining agreement which had expired." Because, as the majority held in *Nolde*, "the resolution of that claim hinges on the interpretation ultimately given the contract clause [on discharge without cause], * * * [t]he dispute, * * * although arising *after* the expiration of the collective bargaining contract, clearly arises *under* that contract." *Id.*

Accordingly, the majority's theory is wrong on the facts and on the law. Most importantly, it fails to discuss how CRST's posted promise became a unilateral contract to abide by the grievance procedure. In any event, the Court should apply the *Nolde* presumption, and, once this is done, it becomes apparent that CRST did not meet its obligation to make clear that post-expiration grievances were no longer arbitrable. CRST could easily have added such a statement to its notice to its employees which alleged that "other working conditions" would continue in effect. However, it did not do so. Indeed, CRST did not make clear its intention not to abide by its "final offer" and its arbitration and wrongful discharge provisions until it decided to discharge Jerry Ottaway.

The majority opinion not only is contrary to *Nolde*, but it also allows CRST to be deceptive in its employment policies. Additionally, it skews our labor law policy of allowing the parties to settle their differences on the economic battlefield, after their respective positions have been made clear. Finally, because the Ottaway wrongful discharge dispute will in any event be justiciable in federal district court under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, the majority opinion simply defers resolution of the dispute to a more costly, inconvenient, and time consuming forum.

WOLLMAN, Circuit Judge, dissenting.

I join in Part II of Chief Judge LAY's dissent.